UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| **MICHAEL S. LELAND and** | * | Chapter 13 |
| **KAREN S. LELAND,** | * | |
| Debtors | * | |
| | * | Case No.: 1-05-bk-06045 |
| **LINDA CRUICKSHANK** | * | |
| **KIMBERLY S. KAUFFMAN,** | * | |
| Objectants | * | (Objection to Plan) |
| | * | |
| v. | * | |
| | * | |
| **MICHAEL S. LELAND and** | * | |
| **KAREN S. LELAND,** | * | |
| Respondents | * | |
| | * | |

## OPINION

This matter is before the Court on the objection of Linda Cruickshank and Kimberly S. Kauffman (the "Objection") to the amended chapter 13 plan ("Amended Plan") filed by Michael and Karen Leland ("Debtors") on March 1, 2006. The Objection asserts that the Amended Plan was filed in bad faith. This Court has jurisdiction over this matter pursuant to 28 U.S.C §§157(a), 1334. This is a "core proceeding" within the meaning of 28 U.S.C. §§157(b) and (b)(2)(L).[1]

### Procedural and Factual History

Debtors filed a voluntary petition for relief and a chapter 13 plan on September 9, 2005. On January 30, 2006, Linda Cruickshank ("Cruickshank") filed an objection to the plan. On March 1, 2006, Debtors filed an amended plan, which was followed by an

---

[1] This Memorandum Opinion constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

objection filed by Cruickshank and Kimberly S. Kauffman ("Kauffman") (collectively, "Objectants"). Objectants are the estranged sister and step-sister of Debtor Michael Leland ("Leland"). Their Objection to the Amended Plan stems from their displeasure with Leland's pre-petition management of the assets of their now-deceased father, Elmer S. Leland, Jr. ("Decedent"). In late 1999, Decedent appointed Leland as his power of attorney and, shortly thereafter, Decedent began living with Debtors. Mrs. Leland quit her job to care for Decedent, but in June 2000 his deteriorating diabetic condition required him to enter a nursing care facility where he resided until his death in June 2003. Leland remained Decedent's agent under the power of attorney until Decedent's death. Decedent's will, which was probated in York County, named his four children – Leland, Marianne Zopp ("Zopp"), Cruickshank and Kauffman – as beneficiaries of his estate in equal shares.[2] On October 19, 2004, Objectants and Zopp[3] petitioned the Orphans' Court of York County for a citation requiring Leland to file an accounting of his administration of Decedent's assets while he served as attorney-in-fact. The petition was granted and a citation was issued returnable November 12, 2004.[4] According to Cruickshank, a hearing

---

[2]Marian Leland, Decedent's wife and the primary beneficiary of Decedent's will, predeceased him.

[3]Zopp is referred to as Marianne, Marian and Marilyn in various pleadings and exhibits. Zopp is listed as a Petitioner in the Brief in Support of Objection to Chapter 13 Plan filed June 14, 2006 although she was not listed as a party to the Objection. Curiously, only Cruickshank and Zopp are listed as unsecured creditors of the bankruptcy estate. Neither Kauffman individually nor Cruickshank, Zopp and Kauffman as Executors of the Estate of Elmer L. Leland, Jr. are listed as creditors.

[4]No testimony was offered about the hearing set by the Orphans' Court for this date. Therefore, the Court is unaware of whether or not a hearing was convened on November 12, 2004.

-2-

was scheduled for October 3, 2005 on the accounting demanded by the state court. Before the hearing could be convened, Debtors filed their petition under chapter 13. The bar date for filing claims was January 25, 2006, and no proofs of claim have been filed on behalf of Objectants, Zopp or Decedent's estate.

Objectants contend that Debtors' Amended Plan was filed in bad faith for the following reasons: a) Debtors failed to include Leland's interest in his father's estate in Debtors' schedules; b) Debtors failed to report the amounts paid to Mrs. Leland for Decedent's care as income on their 2001 and 2002 tax returns; c) Debtors undervalued their home on schedule "A;" and d) Debtors used funds withdrawn from Decedent's account for their own benefit. Debtors responded to these allegations by amending their schedules to include Leland's interest in his father's estate and to increase the value of their home as established in a formal appraisal. In response to the allegation that Debtors filed inaccurate tax returns and that Leland misappropriated funds for his own use, Debtors asserted that the monies received from Decedent either were gifts or were used to pay for Decedent's care. The hearing on the Objection was held on April 7, 2006. This matter has been fully briefed and is ripe for decision.

### Discussion

Objectants contend that the Debtors' Amended Plan was not filed in good faith and urge the Court to sustain their Objection to confirmation of the Amended Plan. The threshold issue before the Court is whether Objectants have standing to object to confirmation. "A party in interest may object to the confirmation of the plan." 11 U.S.C. § 1324. "The Bankruptcy Code does not define 'party in interest,' [but] any holder of an allowed unsecured claim may object to confirmation of the plan on the grounds that it

-3-

fails to comply with one or more of the requirements of section 1325." *In re Stewart*, 46 B.R. 73, 75 (Bankr. D. Or. 1985) (internal citations omitted). Rule 3002(a) in relative part states, "An unsecured creditor . . . must file a proof of claim or interest for the claim or interest to be allowed." "Any holder of an allowed unsecured claim may object to the confirmation of the plan . . . . However, a creditor who does not hold an allowed claim, because a claim was never filed or for some other reason, is not a party in interest with standing to object to confirmation of the plan." *In re Aronson*, No.94-2497, 1994 U.S. Dist. LEXIS 12811 (Bankr. E.D. Pa. 1994) (citing 5 *Collier on Bankruptcy*, § 1324, ¶ 1324.01[3] (Lawrence P. King ed., 15th ed. 1994). Objectants do not hold an allowed unsecured claim because they failed to file a proof of claim in Debtors' case either in their individual capacity or as executors of Decedent's estate. Consequently, they have no standing as a party in interest to object to confirmation of the Amended Plan. Irrespective of Objectants' lack of standing, however, a bankruptcy court must make its own determination as to whether a plan is filed in good faith. 11 U.S.C. § 1325(a)(3). *See In re Vincente*, 257 B.R. 168, 173 (Bankr. E.D. Pa. 2001) ("[T]he Court has an independent duty to determine whether the Debtor's plan satisfies the mandatory requirements of § 1325(a)."); *In re Fricker*, 116 B.R. 431, 437 (Bankr. E.D. Pa. 1990) ("[W]e also have the discretion to deny confirmation sua sponte if we uncover a violation of this or any other Code section and decline to confirm a plan on that basis. . . . Moreover, we are empowered to raise §§ 1325(a)(3), (a)(5), or (a)(6) objections sua sponte at the confirmation hearings.")

      Keeping in mind that a debtor bears the burden of proving that a plan was filed in good faith, *In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992), I will review the Amended

Plan and the circumstances surrounding its filing to determine whether it meets the requirements for confirmation set forth in 11 U.S.C. § 1325(a). Section 1325(a)(3) states that "the court shall confirm a plan if . . . the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1325(a)(3). To determine whether a case has been filed in good faith a "bankruptcy court must look at factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentations to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." *Educational Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987) (cited in *In re Norwood,* 178 B.R. 683, 688 (Bankr. E.D. Pa. 1995)); *New Jersey Lawyers' Fund for Client Protection v. Goddard (In re Goddard)*, 212 B.R. 233, 240 (D. N.J. 1997). *See also In re Butt*, No. 97-17695, 1999 WL 1038241, *5 (Bankr. S.D. Ohio 1999). Lack of good faith in proposing a chapter 13 plan focuses on whether the plan demonstrates an abuse of the "provisions, purpose, or spirit" of chapter 13. *Matter of Smith*, 848 F.2d 813, 818 (7th Cir. 1988) (quoting *In re Rimgale*, 669 F.2d 426, 431(7th Cir. 1982)).

When analyzing a debtor's good faith, the court must be wary of "moralizing" about a debtor's conduct prepetition. *In re Norwood*, 178 B.R. at 688. Nonetheless, an examination of a debtor's conduct, both before and after a petition is filed, is part of the totality of circumstances analysis when a court considers whether a plan has been filed in good faith. *In re Solomon,* 67 F.3d 1128, 1134 (4th Cir. 1995); *In re Tucker,* 989 F.2d 328, 330 (9th Cir. 1993).

*a. Have Debtors stated their debts and expenses accurately?*

In their Objection, Objectants did not question the accuracy of Debtors' stated debts and expenses. At the hearing, however, they challenged the validity of Leland's commuting expenses and the costs incurred by Debtors to maintain a car for their son who is at college and only uses the vehicle when he is home. While the precise amount of Leland's commuting expense was not established, the discrepancy between the alleged and actual expenses was minimal. Therefore, I will allow Debtors' commuting expenses as listed on schedule "J." However, it is not reasonable for Debtors to assume responsibility for car expenses for their son. Therefore, these expenses are disallowed and should be included in the calculation of Debtors' disposable income.

Objectants questioned Leland about numerous unexplained debts listed on schedule "F," including a loan of approximately $22,000.00 incurred in 2003 and secured by a second mortgage on Debtors' home, a Wells Fargo personal loan of approximately $10,000.00 incurred in 2004, and a loan of approximately $9,000.00 incurred in 2004 through Household Finance. The accuracy of these debts was not questioned, but Objectants had limited success eliciting explanations from Leland as to how the loan proceeds were used. Leland's response consisted of vague comments that the funds were used to pay expenses. Objectants demonstrated through Leland's testimony that Debtors obtained loans in excess of $85,000.00 (including a loan against Leland's pension) during the two years prior to filing. In addition to loans from commercial lenders, between 1999 and 2003, Debtors disbursed approximately $200,000.00 from Decedent's bank account, most of which either was paid to Mrs. Leland to compensate her for care she provided to Decedent, was used by Debtors to improve their residence or was distributed to Leland

-6-

himself as "gifts" from Decedent.[5] Although Objectants established that Debtors incurred significant debt in the two years prior to filing and could not explain how they spent the proceeds, they did not establish that Debtors failed to accurately report their debts and expenses.

      *b.     Did Debtors make fraudulent misrepresentations to mislead the bankruptcy court?*

Fraudulent misrepresentation is defined as "a false statement that is made to be false or is made recklessly–without knowing or caring whether it is true or false–and that is intended to induce a party to detrimentally rely on it." *Black's Law Dictionary* (7th ed. 1999). In the bankruptcy context, debtors have an obligation to make full and accurate disclosure of their assets and to verify the accuracy of their schedules under penalty of perjury. *See Johnson v. Lewis Cass Intermediate Sch. Dist. (In re Johnson)*, 345 B.R. 816, 825 (Bankr. D. Mich. 2006) ("It was the Debtor's responsibility to verify the accuracy of the information contained in her schedules and statement of financial affairs and she had the duty to carefully consider all of the questions posed and to see that they [were] completely and correctly answered." (internal citations omitted)). Objectants contend that Debtors did not make an accurate disclosure on their Statement of Financial Affairs ("SOFA") by omitting the pending litigation in the Orphans' Court. Leland testified that the demand for an accounting was not listed because there "wasn't anything financial attached to it at the time." He further testified that he informed his counsel about the litigation. However, no explanation was provided as to why the litigation,

---

[5]Approximately $135,000.00 of the funds were received by Debtors after Decedent moved to a nursing care facility.

-7-

which obviously did have "something financial" about it, was omitted from the SOFA, or why the SOFA was not amended to report the suit once the omission was identified. The only reference to the litigation in Debtors' schedules and statements was a statement in schedule "F" naming Cruickshank and Zopp as creditors, with the nature of the debt characterized as "possible litigation." But does Debtors' failure to include the details of the suit, other than this oblique reference in schedule "F," constitute a fraudulent representation? I think not. Although the omission of the Orphans' Court suit demonstrates that the SOFA was prepared in a thoughtless, sloppy manner, Debtors did not attempt to conceal the existence of the litigation or to impair the ability of Objectants to assert their rights in this proceeding. I do not find that this omission constitutes a fraudulent misrepresentation.

As an additional basis for a finding of bad faith, Objectants cite Debtors' failure to report compensation received by Mrs. Leland – allegedly for providing "healthcare" services for Decedent – on their tax returns for 2000 and 2001. Objectants are correct that Debtors were less than forthright about the payments made to Mrs. Leland. In an attempt to justify the disbursement of his father's funds, Leland prepared a list of payments that included $31,000.00 paid as compensation for services provided by Mrs. Leland to Decedent between April 2000 and March 2001. When confronted by evidence that the 2000 and 2001 tax returns failed to report these disbursements as income, Leland asserted that the monies received were "gifts." Debtors cannot have it both ways.[6] The

---

[6] The accounting provided by Leland lists $31,000.00 as payments from Decedent to Mrs. Leland. An additional $110,300.00 was paid to Mrs. Leland by Leland for which no explanation was provided.

-8-

$31,000.00 received and referred to in Exhibit "D" prepared by Leland states that the funds were paid as compensation for services. I find that this admission establishes that these funds were income to Debtors and, therefore, should have been reported on Debtors' income tax returns for the relevant periods.[7] Leland also admitted to receiving $57,420.00 as gifts and for various home renovations which Decedent allegedly also intended as gifts.[8] Objectants contend that the exclusion of such income establishes bad faith on the part of Debtors. Such omissions, however, are not fraudulent misrepresentations in the instant case. Although the failure to report taxable income may be fraudulent for tax purposes, Debtors were not required to include this information in the SOFA. While an argument may be made that the failure to report the income is fraudulent because Debtors stated that no taxes were due to any governmental unit, insufficient evidence was provided to establish that taxes were in fact due and not disclosed. Therefore, I do not find that Debtor made fraudulent misrepresentations to the court.[9]

---

[7]The relevant tax reporting periods for Debtors' SOFA was 2003, 2004 and the partial year for 2005. Because the payments characterized by Leland as "compensation" were paid in 2000 and 2001 they were not required to be disclosed on Debtors' SOFA.

[8]During testimony, Cruickshank acknowledged that Decedent told her that he gave Leland a gift of $30,000.

[9]Both parties proceeded at the hearing as if it were a trial on the accounting before the Orphans' Court. Debtors attempted to establish that the disbursements made by Leland were justified while Objectants sought to prove that they constituted a defalcation by a fiduciary. However, even if I find that Leland committed fraud while acting as a fiduciary, the debt remains dischargeable if Debtors complete a confirmed chapter 13 plan. 11 U.S.C. § 1328(a)(4).

Case 1:05-bk-06045-MDF    Doc 33    Filed 10/13/06    Entered 10/16/06 10:02:29    Desc
Main Document      Page 9 of 12

*c.     Did Debtors unfairly manipulate the Bankruptcy Code?*

"While pre-filing conduct is not determinative of the good faith issue, it is nevertheless relevant." *See*, *In re Doersam*, 849 F.2d 237, 239 (6th Cir. 1988); *Matter of Smith*, 848 F.2d 813, 818; *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986). The timing of the filing of Debtors' petition shortly before Leland would have been required to account to the Orphan's Court is suspect. "[W]here debtors have filed for bankruptcy soon after the entry of a judgment . . . , courts have found that such filing indicates debtor's desire to use bankruptcy procedures to avoid paying a debt rather than for rehabilitation." *Matter of Smith,* 848 F.2d at 821 (internal citations omitted). However, it would be inappropriate to assume that the Orphan's Court would rule in favor of Objectants when the case has not yet been tried. Unlike the facts in *In re Myers*, 334 B.R. 136, (E.D. Pa. 2005), cited by Objectants, the state court was not poised to issue a judgment against Leland immediately before Debtors filed their Petition. *See also Myers v. S. Med. Supply Co. (In re Myers)*, 2004 Bankr. Lexis 2402 (Bankr. E.D. Pa. 2004) (holding that while the timing of a petition's filing is certainly a relevant factor in the bad-faith inquiry, it would not in itself constitute bad faith). Further, although the timing of the petition is a significant factor when determining whether a petition has been filed in good faith, it is less significant when evaluating whether a plan has been proposed in good faith. "[T]he good faith inquiry under Section 1307(c) is a broad inquiry focusing on the fairness involved in the initiation of Chapter 13 bankruptcy proceedings, while the good faith inquiry under Section 1325[a] is a more narrow inquiry focusing on the good faith with regard to the Chapter 13 plan." *In re Love*, 957 F.2d at 1360. *See also In re Goddard*, 212 B.R. at 238, n. 4; *In re Butt*, 1999 WL 1038241 at *5. The mere timing of

-10-

the filing of the petition does not support a finding that the Amended Plan was not proposed in good faith. A judgment was not imminent, and Debtors had numerous other debts that they were unable to pay.

>  d. *Has there been an abuse of the provisions, purpose, or spirit of chapter 13 in the proposed plan?*

The "purpose of the Bankruptcy Code is to give the honest but unfortunate debtor a fresh start." *Dollar Bank, FSB v. Tarbuck (In re Tarbuck)*, 318 B.R. 78, 85 (Bankr. W.D. Pa. 2004). "[T]he basic purpose and spirit of Chapter 13 is rehabilitation and repayment of debt by periodic payments made to a trustee under bankruptcy court protection, with the aim of providing honest, unfortunate and genuinely financially distressed debtors an opportunity to obtain a fresh start." *In re McGovern,* 297 B.R. 650, 658 (S.D. Fla. 2003). In the instant case, Debtors have significant unsecured debt totaling $63,300.00 and secured debt of $106,970.00, without including claims of Objectants or of Decedent's estate. Debtors apparently financed a lifestyle they could not afford using Decedent's funds. They regarded Decedent's assets as a slush fund available for their personal use when their own income was insufficient to meet their wants. When those funds no longer were available, they sank deeper into debt. Debtors' need for chapter 13 relief appears genuine. However, they have not been forthright with the Court or with their creditors. They have proposed to contribute only $235.00 per month to their chapter 13 plan when they state on schedule "J" that they have $485.00 a month in disposable income.[10] This failure to make a sincere effort to commit all disposable income to

---

[10]At the hearing Leland testified that his wife had resumed full-time employment. Thus, Debtors disposable income may now exceed $485.00 per month.

-11-

funding the Amended Plan demonstrates that Debtors are attempting to abuse the spirit of chapter 13.

## Conclusion

After considering the factors set forth above in the totality of the circumstances, I conclude that Debtors' plan was not filed in good faith. An appropriate order will be entered.

BY THE COURT,

*Mary D. France*
Bankruptcy Judge

Date: October 13, 2006

*This document is electronically signed and filed on the same date.*

-12-